# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### December 15, 2010 Session

## STATE OF TENNESSEE v. GARY DWAYNE JOHNSON

**Appeal from the Criminal Court for Davidson County**
**No.2007-A-692      Monte Watkins, Judge**

---

**No. M2009-00157-CCA-R3-CD - Filed March 7, 2011**

---

Following a jury trial, the Defendant, Gary Dwayne Johnson, was convicted of one count of reckless endangerment, a Class E felony, one count of robbery, a Class C felony, one count of assault, a Class A misdemeanor, two counts of carjacking, Class B felonies, one count of especially aggravated kidnapping, a Class A felony, and one count of felony escape, a Class E felony. See Tenn. Code Ann. §§ 39-13-101(b)(1), -13-103, -13-305(b)(1), -13-401(b), -13 -404(b), -16-605(b)(2). The trial court found that the Defendant was a career offender and sentenced him to the following terms: six years for his reckless endangerment conviction, fifteen years for his robbery conviction, eleven months and twenty-nine days for his assault conviction, thirty years for each carjacking conviction, sixty years as a violent offender for his especially aggravated kidnapping conviction, and six years for his felony escape conviction. The trial court merged the Defendant's convictions for reckless endangerment and robbery and ordered that all of his convictions, except the misdemeanor, run consecutively for a total effective sentence of 141 years. In this direct appeal, the Defendant raises the following issues for review: (1) The evidence presented at trial was not sufficient to sustain his convictions for reckless endangerment, robbery, assault, and carjacking; (2) The trial court erred when it sentenced him as a career offender and when it ordered that his sentences run consecutively; and (3) The trial court erred when it denied the Defendant's motion to dismiss his Trial Counsel before the sentencing hearing. Following our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the Court, in which ROBERT W. WEDEMEYER and J.C. MCLIN, JJ., joined.

Matthew Mayo, Nashville, Tennessee; and Michael Meise, Dickson, Tennessee, for the appellant, Gary Dwayne Johnson.

Robert E. Cooper, Jr., Attorney General and Reporter; Deshea Dulany Faughn, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Roger Moore, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

This appeal arises out of events occurring during and after the Defendant's escape from the custody of the Davidson County Sheriff's Office on October 4, 2006. The Defendant's trial was conducted on July 7-9, 2008.

Sergeant Stacy Cummings, employed by the Davidson County Sheriff's Office, testified that, on October 4, 2006, she worked second shift and was assigned to watch an inmate, the Defendant, who was receiving medical treatment at Nashville General Hospital. She recalled that, at approximately 3:30 p.m., the Defendant requested to use the restroom and she unshackled him from his hospital bed. When he finished using the restroom, Sergeant Cummings shackled the Defendant back to the bed without incident.

Approximately ten minutes later, the Defendant requested to use the restroom again. Sergeant Cummings described what happened next as follows:

> This time I unhooked him and unshackled him and he went around to the bathroom. And he was in there a few minutes and then he come [sic] back. And he started to sit down on the bed, I guess, so I could hook him back up. But then he pulled out the IV out of his arm and he pulled the monitors that he had on his chest off and he rushed toward me and pushed me back up against the wall. I hit the wall and then he came back at me again and he punches me in the face.

She then described that she and the Defendant engaged in a long struggle, with him trying to get her weapon and Sergeant Cummings desperately trying to push down on her gun so the Defendant would not be able to get it. Eventually, the Defendant was able to pull out Sergeant Cummings' weapon from its holster. She described what happened next as follows:

> [H]e had it and I had it and we were wrestling with it. . . . [H]e had the handle and the trigger, and my hands was on top of it. And then he got all the way up to my head and then it discharged, you know. And then he hit me one more time and then, I kind[] of hit the floor. And the[n] he told me, he said, "Bitch, I'm not going back to jail," and then he ran out the door, and that was that.

-2-

Sergeant Cummings described that, when the gun discharged, she heard the bullet go past her ear. She testified that, as a result of the altercation with the Defendant, she broke her left ankle, twisted her right ankle, skinned and bruised both of her knees and elbows, and sustained bruises on her face.

Azmera Belay, a nurse at Nashville General Hospital, testified that, on October 4, 2006, she heard Sergeant Cummings call for help. She recalled that she observed a male with his arms around Sergeant Cummings and that she went to the nurses' station and called for help. She went back to the Defendant's hospital room and saw Sergeant Cummings on the floor facing down, with the Defendant on top of her. Ms. Belay testified that she tried to push the Defendant off of Sergeant Cummings, but the gun fired and she ran out of the room because she was scared. Ms. Belay recalled that she received a small scratch on her left forearm when she tried to push the Defendant off of Sergeant Cummings. She also stated that she saw the Defendant leave the hospital room and get on the elevator.

Anna Cox testified that, on October 4, 2006, she worked for Quest Diagnostics, a laboratory that processed blood and urine samples. Ms. Cox recalled that, at approximately 4:00 p.m., she had just arrived at Nashville General Hospital to make her regular daily pick-up when the Defendant came up to her and said, "Give me your keys." She described what occurred next as follows:

> [M]y first thought was I just sort of shrugged my shoulders and said[,] "I can't do that." And he immediately said, "Give me your keys or I'll shoot you." And I glanced down and he had a gun pointing at my ribs.
>
> . . . .
>
> Then I just put my hands up like just at shoulder height, and my mouth fell open. I immediately went into shock. . . . I didn't know what to say or do. And he just reached into my pocket and took my keys.

Ms. Cox recalled that later she went to the scene where her vehicle had been recovered. She said that she saw that her wallet had been rummaged through, spare change was taken from the vehicle, and her cigarettes and lighter were missing.

Tracie Mosley testified that, on the afternoon of October 4, 2006, she, her two children, and her sister went to a grocery store in West Nashville. She recalled that, when she came out of the store, the Defendant was in her sister's car and was talking to her sister. Ms. Mosley said that the Defendant claimed he escaped from a mental ward and offered the

women twenty dollars to give him a ride. Her sister decided to take the Defendant up on his offer, and the Defendant paid her. They went to Ms. Mosley's house so she could put away her groceries. Ms. Mosley said that she let the Defendant have some spare clothes, as he was only wearing a tee-shirt and boxer shorts.

The Defendant then offered Ms. Mosley's friend, T.T., twenty-five dollars to take him to his brother's house. T.T. accepted the offer, and the Defendant paid her. Ms. Mosley accompanied T.T. and the Defendant on the trip in T.T.'s green car. While they were in the car, Ms. Mosley's daughter called and told her mother, "Mama, that man that y'all giving a ride to he's escaped from Metro General Hospital." Ms. Mosley said that she handed the phone to T.T. so that her daughter could tell her too and, at that point, T.T. started to panic.

Ms. Mosley testified that T.T. pulled the car over and asked the Defendant to get out of the car. She recalled that the Defendant would not get out of the car, so T.T. jumped out and started running. Ms. Mosley described the events occurring next as follows:

> He jumped across the seat. So, I tried to grab the keys out of the car because I didn't want him to take the car. And I told him, I said, "I'm not going to let you take my girl's car," like that. And that's when he took and let me see that gun. And when he showed me the gun, and he was pulling out, I just jumped out of the car while he was backing out. And the car was moving when I jumped out of the car door.

Jeffrey Conyers testified that he had just finished cutting the grass at his new house when the Defendant, who was driving a green Mazda, pulled into his driveway and asked for directions to the interstate. Mr. Conyers recalled that the Defendant then got out of the car, put a pistol to his forehead, and told him to get into his truck. He described what happened next as follows:

> I actually started towards my driver's side door out of habit, and he grabbed my shoulder and directed me around towards the passenger side of the truck and made me get in the passenger side. He just kind of pushed me across the seat into the driver's seat, and he just kept saying[,] "Drive, drive, drive."

Mr. Conyers stated that "the [D]efendant was hunkered down into the floorboard and had the gun pointed at [him]." When he asked the Defendant where to go, the Defendant replied, "Just get us out of here." Mr. Conyers recalled that he saw a police officer on the second street they were on, but was not able to get his attention. He testified that he drove down Lebanon Pike and Andrew Jackson Parkway until they reached I-65 and traveled north.

Mr. Conyers testified that the Defendant ordered him to make several stops. First, they exited the interstate around Portland and, still at gunpoint, the Defendant directed Mr. Conyers to go to a bank ATM and withdraw money. Mr. Conyers testified that he was able to withdraw a total of $900 from the ATM. He recalled that they went back to the interstate and continued heading north into Kentucky, until the Defendant told him to turn around and travel south back to Tennessee. The Defendant then ordered him to exit, go to a gas station, and buy him a pack of cigarettes. Mr. Conyers stated that the gas station had an attendant who got them the cigarettes and that he did not need to leave his truck. Next, the Defendant had Mr. Conyers stop at another gas station so he could use the pay phone. Mr. Conyers testified that the Defendant took the keys out of the ignition, took Mr. Conyers' cell phone, and stepped out of the vehicle so he could use the phone. Next, the Defendant told Mr. Conyers to stop at a McDonald's drive-thru window.

They continued to travel south on the interstate. They eventually exited the interstate, and the Defendant directed Mr. Conyers down "little country roads." Mr. Conyers stated, "I was actually pretty fearful at that point that if there was ever a point that I was going to be exiting the picture it would probably be right here." While they were driving on these back roads, the Defendant ordered Mr. Conyers to stop the car so that he could urinate. The Defendant took the keys out of the ignition while they were stopped.

The men eventually pulled into a Kroger parking lot in Millersville. The Defendant told Mr. Conyers that someone he knew was going to give him a ride. The Defendant instructed Mr. Conyers to take off his shirt, and the Defendant put on Mr. Conyers' shirt. Mr. Conyers described what happened next as follows:

> I assumed that we were waiting for his ride to show up, whoever that was. He took my phone from me and actually took the battery out of my phone and left the phone, and told me that—I said, I just want to go home. And he said that he and this person that was picking him up would be following me on the interstate and if I made a stop for any reason that he would stop me and kill me. And then he got out of the truck and walked towards the front of the store. I didn't wait around to see who he was meeting. I got out of there as quick as I could.

He stated that, soon after he got onto the interstate, he saw that a police officer and another motorist were stopped on the side of the road. Mr. Conyers said that he pulled over and ran to the officer for help. Mr. Conyers recalled that he had asked the Defendant why he was doing all this and that the Defendant indicated that he was not going to go back to jail. Mr. Conyers estimated that the whole ordeal lasted between four and five hours.

Kevin Carroll, an internal affairs investigator with the Davidson County Sheriff's Office, testified that the Defendant was taken back into custody in Indianapolis, Indiana on October 6, 2006. He also testified that, based on information received from individuals who had been in contact with the Defendant, Sergeant Cummings' firearm was recovered near railroad tracks in Elizabethtown, Kentucky the next day.

Patrick Wells, a private investigator, testified on behalf of the Defendant. He recalled that he spoke with Ms. Belay on May 6, 2008, and she told him that Sergeant Cummings "had the gun out in her left hand, she heard gun shots and then took off," as opposed to her testimony in court that she saw the gun only by Sergeant Cummings' waist. Mr. Wells also acknowledged that Ms. Belay told him that the Defendant and Sergeant Cummings were struggling and that the Defendant eventually gained possession of the firearm.

Jeremy Nix testified that he was at a Kroger in White House in October 2006 when the Defendant approached his car and asked him for a ride "up the road a couple of exits." Mr. Nix said that he agreed to give the Defendant a ride, that the Defendant paid him money for the trip, and that the Defendant never threatened him or displayed a weapon. While Mr. Nix and the Defendant were driving, Mr. Nix received a call on his cell phone from the Kentucky Highway Patrol, who informed him that he had "an armed and dangerous subject in [his] car." Mr. Nix testified that he noticed the Defendant was getting nervous, so he told the officer on the phone that he had already dropped off the Defendant. Mr. Nix continued to drive the Defendant for approximately ten minutes and then dropped him off.

The following chart illustrates which offenses the Defendant was charged with and for which offenses the jury convicted him:

| Count | Charged Offense | Class | Victim | Convicted Offense | Class |
|-------|-----------------|-------|--------|-------------------|-------|
| 1 | Attempted First Degree Murder | A felony | Sergeant Cummings | Reckless Endangerment | E felony |
| 2 | Robbery | C felony | Sergeant Cummings | Robbery | C felony |
| 3 | Aggravated Assault | C felony | Ms. Belay | Assault | A misdemeanor |
| 4 | Carjacking | B felony | Ms. Cox | Carjacking | B felony |
| 5 | Carjacking | B felony | Ms. Mosley | Carjacking | B felony |

| 6 | Especially Aggravated Kidnapping | A felony | Mr. Conyers | Especially Aggravated Kidnapping | A felony |
| 7 | Felony Escape | E felony | N/A | Felony Escape | E felony |

The Defendant's sentencing hearing was conducted on September 17, 2009. The trial court found that the Defendant was a career offender and sentenced him to the following terms: six years for his reckless endangerment conviction, fifteen years for his robbery conviction, eleven months and twenty-nine days for his assault conviction, thirty years for each carjacking conviction, sixty years as a violent offender for his especially aggravated kidnapping conviction, and six years for his felony escape conviction. The trial court merged the Defendant's convictions for reckless endangerment and robbery and ordered that all of his convictions, except the misdemeanor, run consecutively for a total effective sentence of 141 years. The Defendant now appeals.

**Analysis**

The issues that the Defendant raises in this direct appeal are as follows: (1) The evidence presented at trial was not sufficient to sustain his convictions for reckless endangerment, robbery, assault, and carjacking (of Ms. Mosley); (2) The trial court erred when it sentenced him as a career offender and when it ordered that his sentences run consecutively; and (3) The trial court erred when it denied his motion to dismiss his Trial Counsel before the sentencing hearing.[1]

**I. Sufficiency**

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the

---

[1] We note that the Defendant's original Appellate Counsel submitted a brief on his behalf. However, this Court appointed Attorney Michael Meise to represent the Defendant after we learned that his original Appellate Counsel had been temporarily suspended from the practice of law. We allowed Attorney Meise to submit an amended or substituted brief on behalf of the Defendant, and he did. Our summary of the issues presented in this appeal reflect all of the arguments raised by both of the Defendant's attorneys.

evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

### A. Reckless Endangerment

Tennessee Code Annotated section 39-13-103(a) provides that a person "who recklessly engages in conduct that places or may place another person in imminent danger of death or serious bodily injury" commits reckless endangerment. "[R]eckless endangerment committed with a deadly weapon is a Class E felony." Tenn. Code Ann. § 39-13-103(b).

Sergeant Cummings testified that, while she was struggling with the Defendant in his hospital room, two tables were knocked over. However, the pictures of the crime scene introduced during the trial did not reflect that the furniture had been disturbed. Moreover, one of the photos depicted a shell casing standing upright on a table. The Defendant argues that "[t]he photo evidence of the crime scene completely contradicts" the testimony of Sergeant Cummings and, therefore, the evidence was insufficient to convict him of reckless endangerment. We cannot agree.

Although the photos depicted a less disheveled hospital room than Sergeant Cummings described, Officer Thomas Simpkins testified that, while he was processing the hospital room for evidence, "someone told us that they had moved [the shell casing]." Officer Simpkins also said that his investigation led him to conclude that the bullet struck the floor and then bounced up into the wall. Sergeant Cummings testified that she struggled with the Defendant and that he eventually was able to remove her firearm from its holster. She said that, while she and the Defendant were fighting for the gun, the Defendant had his hands on the handle and the trigger. Sergeant Cummings recalled that the gun discharged next to her head while the two were fighting for control of the weapon. We conclude that the State

presented sufficient evidence for a jury to find beyond a reasonable doubt that the Defendant recklessly engaged in conduct that placed Sergeant Cummings in imminent danger of death or serious bodily injury. The Defendant is not entitled to relief on this issue.

### B. Robbery

"Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a). Sergeant Cummings testified that the Defendant started to sit down on the bed after his second trip to the restroom, but then he pushed her against the wall and punched her in the face. She then stated that she and the Defendant engaged in a long struggle, with him trying to get her weapon and Sergeant Cummings desperately trying to push down on her gun so the Defendant would not be able to get it. Eventually, the Defendant was able to remove her firearm from its holster and the gun discharged while they continued to struggle. After the gun fired, the Defendant hit Sergeant Cummings again, said, "Bitch, I'm not going back to jail," and then ran out the door. Sergeant Cummings testified that, after the gun fired, the Defendant had control over the firearm. Moreover, Ms. Cox, Ms. Mosley, and Mr. Conyers each testified that the Defendant had a gun that afternoon when he committed subsequent crimes against them. Finally, Investigator Carroll stated that, based on information received from individuals who had been in contact with the Defendant, Sergeant Cummings' firearm was recovered near railroad tracks in Elizabethtown, Kentucky on October 7, 2006. Thus, we conclude that the State presented sufficient evidence for a jury to find beyond a reasonable doubt that the Defendant intentionally took Sergeant Cummings' firearm from her using violence. The Defendant is not entitled to relief on this issue.

### C. Assault

One of the issues that the Defendant presents for review is stated as follows: "The evidence is not sufficient to sustain a conviction of reckless endangerment (count one) and assault (count three)." However, the argument contained in his brief focuses solely on the reckless endangerment count related to Sergeant Cummings and does not contain any argument supporting his assertion that his conviction for assault on Ms. Belay was not supported by sufficient evidence. Thus, we conclude that this issue has been waived. See Tenn. Ct. Crim. App. R. 10(b) (providing that "[i]ssues which are not supported by argument, citation to authorities, or appropriate references will be treated as waived in this court").

### D. Carjacking

"'Carjacking' is the intentional or knowing taking of a motor vehicle from the possession of another by use of: (1) A deadly weapon; or (2) Force or intimidation." Tenn. Code Ann. § 39-13-404(a). Ms. Mosley testified that, while she and T.T. were giving the Defendant a ride, they received a call from her daughter informing them that the Defendant had escaped from the hospital. Ms. Mosley described that T.T. panicked, pulled the car over,

and asked the Defendant to get out of the vehicle. Ms. Mosley recalled that the Defendant would not get out of the car, so T.T. jumped out and started to run. She testified that she tried to get the keys out of the car, but that the Defendant showed her that he had a gun. The Defendant started to drive away, and Ms. Mosley jumped out of the car while it was moving. We conclude that the State presented sufficient evidence for a jury to find beyond a reasonable doubt that the Defendant intentionally took a motor vehicle from Ms. Mosley's possession by the use of a deadly weapon. The Defendant is not entitled to relief on this issue.

## II. Sentence

The Defendant argues that the trial court erred when it found that he was a career offender and when it sentenced him to consecutive sentences for a total effective sentence of 141 years. The Defendant also contends that the sentence imposed by the trial court is excessive and constitutes cruel and unusual punishment.

On appeal, the party challenging the sentence imposed by the trial court has the burden of establishing that the sentence is erroneous. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Comments; see also State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). When a defendant challenges the length, range, or manner of service of a sentence, it is the duty of this Court to conduct a de novo review on the record with a presumption that the determinations made by the court from which the appeal is taken are correct. Tenn. Code Ann. § 40-35-401(d). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Pettus, 986 S.W.2d 540, 543-44 (Tenn. 1999); see also State v. Carter, 254 S.W.3d 335, 344-45 (Tenn. 2008). If our review reflects that the trial court failed to consider the sentencing principles and all relevant facts and circumstances, then review of the challenged sentence is purely de novo without the presumption of correctness. State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991); see also Carter, 254 S.W.3d at 344-45.

In conducting a de novo review of a sentence, this Court must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; (f) any statistical information provided by the Administrative Office of the Courts as to Tennessee sentencing practices for similar offenses; and (g) any statement the defendant wishes to make in the defendant's own behalf about sentencing. Tenn. Code Ann. § 40-35-210(b); see also Carter, 254 S.W.3d at 343; State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002).

**A. Career Offender**

During the sentencing hearing, the State introduced certified copies of the judgment form for twelve of the Defendant's previous convictions. Those convictions, according to the judgment forms, are summarized as follows:

| Conviction Offense | Offense Date | Class |
|---|---|---|
| Selling Cocaine | 8/22/91 | B felony |
| Selling a controlled substance | 7/26/91 | B felony |
| Aggravated Assault | 11/19/92 | C felony |
| Burglary of a vehicle | 7/3/96 | E felony |
| Robbery | 4/16/98 | C felony |
| Robbery | 4/18-19/98 | C felony |
| Theft under $500 | 3/27/98 | A misdemeanor |
| Robbery | 4/19/98 | C felony |
| Robbery | 4/21/98 | C felony |
| Robbery | 4/21/98 | C felony |
| Robbery | 4/21/98 | C felony |
| Theft over $1,000 | 4/22/98 | D felony |

The trial court found that the Defendant was a career offender and sentenced him as such for each of his convictions. The Defendant argues that the trial court erred when sentencing him as a career offender because his crimes "occurred in bundled spurts within twenty-four (24) hour time frames." The Defendant also asserts that the offense dates listed in his presentence report differ from those on the judgment forms and that, based on the dates in the presentence report, he would not be classified as a career offender because his convictions would merge under the twenty-four-hour rule. See Tenn. Code Ann. § 40-35-108(b)(4).

Section 40-35-108 of Tennessee Code Annotated provides as follows:

(a) A "career offender" is a defendant who has received:

(1)  Any combination of six (6) or more Class A, B or C prior felony convictions, and the defendant's conviction offense is a Class A, B or C felony;

(2)  At least three (3) Class A or any combination of four (4) Class A or Class B felony convictions if the defendant's conviction offense is a Class A or B felony; or

(3)  At least six (6) prior felony convictions of any classification if the defendant's conviction offense is a Class D or E felony.

(b)  In determining the number of prior convictions a defendant has received:

(1)  "Prior conviction" means a conviction for an offense occurring prior to the commission of the offense for which the defendant is being sentenced;

(2)  All prior felony convictions, including those occurring prior to November 1, 1989, are included;

. . . .

(4)  Except for convictions for which the statutory elements include serious bodily injury, bodily injury, threatened serious bodily injury or threatened bodily injury to the victim or victims, convictions for multiple felonies committed within the same twenty-four-hour period constitute one (1) conviction for the purpose of determining prior convictions . . .

. . . .

(c)  A defendant who is found by the court beyond a reasonable doubt to be a career offender shall receive the maximum sentence within the applicable Range III.

Tenn. Code Ann. § 40-35-108 (2006).

Regarding the Defendant's argument about the offense dates differing on the presentence report and the certified copies of the judgment forms, we note that the Defendant did not contest the accuracy of the certified copies of the judgment forms when the State introduced them at the sentencing hearing.[2]  Thus, this issue has been waived. See Tenn. R. App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error.").

---

[2]  Although the State introduced the presentence report, the prosecutor commented that the Defendant's prior criminal history, as listed in the report, was not "necessarily totally accurate" and subsequently introduced the certified copies of some of the Defendant's prior convictions.

As for the trial court's classification of the Defendant as a career offender, we conclude that the trial court did not err. The State introduced certified copies of some of the Defendant's previous convictions and those judgment forms clearly indicate that the Defendant had at least six prior convictions for a Class A, B, or C felony. Moreover, we cannot agree with the Defendant's argument that his crimes were committed in "bundled spurts" within a twenty-four-hour period. The judgment forms in the record indicate the offense dates for his various convictions. Of the Defendant's previous nine convictions for a Class B or C felony for which the State introduced certified copies, at least six were not committed within the same twenty-four-hour period: 8/22/91, selling cocaine; 7/26/91, selling a controlled substance; 11/19/92, aggravated assault; 4/16/98, robbery; 4/19/98, robbery; and 4/21/98, robbery. Thus, the trial court properly classified the Defendant as a career offender. The Defendant is not entitled to relief on this issue.

### B. Consecutive Sentences

Tennessee Code Annotated section 40-35-115(b) provides that a trial court may, in its discretion, order sentences to run consecutively if it finds any one of the following criteria by a preponderance of the evidence:

> (1) The defendant is a professional criminal who has knowingly devoted the defendant's life to criminal acts as a major source of livelihood;
>
> (2) The defendant is an offender whose record of criminal activity is extensive;
>
> (3) The defendant is a dangerous mentally abnormal person so declared by a competent psychiatrist who concludes as a result of an investigation prior to sentencing that the defendant's criminal conduct has been characterized by a pattern of repetitive or compulsive behavior with heedless indifference to consequences;
>
> (4) The defendant is a dangerous offender whose behavior indicates little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high;
>
> (5) The defendant is convicted of two (2) or more statutory offenses involving sexual abuse of a minor with consideration of the aggravating circumstances arising from the relationship between the defendant and victim or victims, the time span of defendant's undetected sexual activity, the nature and scope of the sexual acts and the extent of the residual, physical and mental damage to the victim or victims;

(6) The defendant is sentenced for an offense committed while on probation; or

(7) The defendant is sentenced for criminal contempt.

These criteria are stated in the alternative; therefore, only one need exist to support the appropriateness of consecutive sentencing.

The trial court found that criteria (1), (2), and (4) applied to the Defendant and imposed consecutive sentences. The Defendant argues that his sentence is excessive and contends that the trial court erred when it found that he was a dangerous offender.

Regarding the imposition of consecutive sentences because the defendant is a dangerous offender, our supreme court has held, "The proof must also establish that the terms imposed are reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." State v. Wilkerson, 905 S.W.2d 933, 938 (Tenn. 1995).

During the Defendant's sentencing hearing, the trial court explained its basis for finding that the Defendant was a dangerous offender as follows:

> The [D]efendant is a dangerous offender whose behaviour [sic] indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high. . . . [T]his was demonstrated during the course of the trial relating [sic] the events about his struggle with [Sergeant] Cummings, where they were tussling over a gun, where . . . [Sergeant] Cummings could have very easily been killed or seriously injured. She was, in fact, injured, but not by the gun itself.
>
> This is, also, demonstrated by the fact that Ms. Cox's vehicle was carjacked, although Ms. Cox, again, was not injured but she very well could have been. Ms. Mosley was carjacked. Again, she could have been seriously injured or killed for that matter. And Mr. Conyers was kidnapped and he could have been seriously injured or killed.

The Defendant argues that the trial court should have placed more weight on the facts that he only caused bodily injury to Sergeant Cummings and that he released his subsequent victims. We cannot agree with the Defendant that the trial court erred by not placing more weight on those facts.

-14-

The Defendant's acts clearly showed that he had "little or no regard for human life, and no hesitation about committing a crime in which the risk to human life is high." See Tenn. Code Ann. § 40-35-115(b)(4). He struggled with Sergeant Cummings for her firearm for several minutes, eventually removing it from her holster. Sergeant Cummings testified that the Defendant's hand was on the handle and trigger of the gun when it discharged next to her head. Ms. Cox testified that, when the Defendant carjacked her outside of the hospital, he said, "Give me your keys or I'll shoot you," and that he had the gun pointed at her ribs. Ms. Mosley recalled that, as the Defendant was carjacking her, he showed her that he had a gun. Mr. Conyers testified that the Defendant put a gun to his forehead and ordered him to get into his vehicle. He also recalled that the Defendant repeatedly threatened to kill him if he did not comply with the Defendant's demands. Moreover, given the circumstances of the Defendant's crimes, we conclude that the trial court's imposition of consecutive sentences was "reasonably related to the severity of the offenses committed and are necessary in order to protect the public from further criminal acts by the offender." See Wilkerson, 905 S.W.2d at 938.

Next, we conclude that the Defendant's sentence is not excessive. The trial court properly found that the Defendant was a career offender. Our legislature has provided that the mandatory sentences for career offenders is: sixty years for Class A felonies, thirty years for Class B felonies, fifteen years for Class C felonies, twelve years for Class D felonies, and six years for class E felonies. See Tenn. Code Ann. §§ 40-35-108(c), -112(c). The trial court sentenced the Defendant per our statutory scheme and, as we discussed above, properly imposed consecutive sentences. Therefore, Defendant is not entitled to relief on this issue.

### C. Cruel and Unusual Punishment

The Defendant also asserts that his 141-year sentence is "grossly disproportionate" to his offenses and constitutes cruel and unusual punishment in violation of article I, section 16 of the Tennessee Constitution. We disagree.

In State v. Harris, 844 S.W.2d 601, 602 (Tenn. 1992), the Tennessee Supreme Court adopted a proportionality analysis by which courts initially compare the sentence imposed to the crime committed. Id. at 603 (citing Justice Kennedy's concurrence in Harmelin v. Michigan, 501 U.S. 957, 997-1009 (1991) (Kennedy, J., concurring in part and concurring in the judgment)). However, the court noted that "'[o]utside the context of capital punishment, *successful* challenges to the proportionality of particular sentences [will be] exceedingly rare.'" Id. at 602 (quoting Solem v. Helm, 463 U.S. 277, 289-90 (1983)). Regarding how to analyze proportionality, our supreme court explained, "Unless this threshold comparison leads to an inference of gross disproportionality, the inquiry ends—the sentence is constitutional." Id. at 603. "Determining whether a penalty for a particular

-15-

offense raises an inference of gross disproportionality entails a comparison between the gravity of the offense and the harshness of the penalty." State v. Smith, 48 S.W.3d 159, 171 (Tenn. Crim. App. 2000) (citing Solem, 463 U.S. at 290-91). The factors relevant to the gravity of the offense include:

> (1) the nature of the crime, including whether society views the crime as serious or relatively minor and whether the crime is violent or non-violent; (2) the circumstances of the crime, including the culpability of the offender, as reflected by his intent and motive, and the magnitude of the crime; and (3) the existence and nature of any prior felonies if used to enhance the defendant's penalty.

Id. (citing Solem, 463 U.S. at 291-97). "Factors relevant to the harshness of a penalty include the type of penalty imposed and, if a term of imprisonment, the length of the term and the availability of parole or other forms of early release." Id.

Considering the Defendant's prior criminal convictions and his obviously unsuccessful attempts at rehabilitation, the Defendant's sentence is not "grossly disproportionate" to his offenses and, therefore, does not constitute cruel and unusual punishment. The Defendant was convicted of one count of especially aggravated kidnapping, a Class A felony, two counts of carjacking, a Class B felony, one count of robbery, a Class C felony, one count of reckless endangerment, a Class E felony, one count of felony escape, a Class E felony, and one count of assault, a Class A misdemeanor. In determining that the Defendant's 141-year sentence is not grossly disproportionate to the gravity of his offenses, we note that the nature of the Defendant's crimes was violent and serious. The Defendant engaged in a long struggle with Sergeant Cummings, removed her firearm from its holster, discharged the weapon next to her head, and fled the hospital with her weapon. He pointed the gun at Ms. Cox's ribs and told her that he would shoot her if she did not give him her car keys. The Defendant also showed Ms. Mosley that he had a gun while he was carjacking her. Finally, the Defendant kidnapped Mr. Conyers at gunpoint and forced Mr. Conyers to drive him around the countryside for four to five hours. The Defendant repeatedly threatened to kill Mr. Conyers if he did not comply with the Defendant's demands. Given the circumstances of the Defendant's offenses, and his at least eleven previous felony convictions, we cannot conclude that the penalty imposed by the trial court was cruel and unusual. The Defendant is not entitled to relief on this issue.

### III. Defendant's Motion to Appoint Substitute Counsel

During the Defendant's sentencing hearing, the following transpired:

[Trial Court]: Okay. I understand, Mr. Johnson, you have submitted a pro se motion for dismissal of counsel[3] and you want to be heard about this. Although, it is really not proper at a sentencing hearing but I will hear what you have to say. So you can stand at the podium and tell me what you have to say.

[The Defendant]: First of all, Your Honor, I have numerous documents that I submitted to [Trial Counsel] pertaining to before trial, and asked him to do, that could have had affect on the matter of my trial and the outcome. A lot of times that I was brought down here to Nashville with the assumption that I was going to be speaking with [Trial Counsel] and preparing for my trial and never did. These documents are letters and things I'd asked him to do. They're for subpoenas and motions and things to file for me that would have had a bearing on my trial; things during trial that I asked him to do that couldn't be done. Also, he stated to me there was some things that happened in the Judge's chamber during trial that should have been an acquittal. When I asked him what it was he said he couldn't talk to me about that right now. And the reason—

[Trial Court]: You said there was some things that happened in the Judge's chambers.

[The Defendant]: Yes, sir. The way—

[Trial Court]: That warranted acquittal in this trial?

[The Defendant]: Yes, sir. Of my charges.

---

[3] The Defendant's pro se motion is not included in the record, however, he has included copies of his motion and affidavit in his brief. The Defendant stated in his brief that he "will be filing a motion to supplement the record to include these documents," however, no motion has been filed. In the affidavit, which he claims was filed the day before his sentencing hearing, the Defendant alleges that his Trial Counsel failed to adequately prepare for trial, failed to subpoena witnesses the Defendant requested him to subpoena, failed to impeach witnesses, failed to challenge forensic evidence, failed to file an adequate suppression motion, failed to present the surveillance tape from the bank, told him that events which occurred in the Judge's chamber warranted acquittal, and failed to ask witnesses questions the Defendant requested him to ask. Even if the Defendant's motion and affidavit were properly in the record, we note that neither one would affect the disposition of the issue the Defendant raises.

[Trial Court]:  Well, let me just state I know of nothing that happened in the Judge's chambers that would have warranted any acquittal of the charges.

[The Defendant]:  But this is what he told me.  It's on the record with the TDOC phone records that [Trial Counsel] did say this.  Like I said, from the start, from the beginning of my case, [Trial Counsel] was coming to see me, but in the middle of it he didn't take no interest.  Really, I didn't have a chance—we didn't have a chance to really prepare for my trial until three days before it was time for me to sit for trial.  After [Trial Counsel] asked for a continuance from you and—

[Trial Court]:  I specifically remember that he came in—we had the trial set.  He asked for a continuance because he had been trying a case, I think, in Division VI—I am not sure about which division.  And the [c]ourt did grant him a continuance to allow him more time to prepare for your trial.  So a continuance was, in fact, granted.

[The Defendant]:  Right, sir.  And here is the paper where he scheduled to see me at Charles Bass, had me brought in, because I didn't get to see [Trial Counsel] because he cancelled it and sent Mr. Patrick Wells.

Like I said, I didn't get a chance to really prepare for my trial with [Trial Counsel] until three days before it was time for me to go to trial, after you gave a continuance on it to give him time to prepare for it.  Like I said, there were things that I asked him to do in my case, legal standpoints, that would have helped me out and [Trial Counsel] just didn't do it, sir.  And, therefore, I don't feel like he could be good as far as this point in my trial or on my appeals or anything.

[Trial Court]:  Okay.  Here—

[The Defendant]:  Because my best interest—

[Trial Court]:  —is what I will do.  I'm going to allow him to stay at this juncture.  I will appoint other counsel for you on your appeal.  But at this juncture he will be your attorney.

The Defendant contends that the trial court erred when it denied his request to appoint substitute counsel.

-18-

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee a criminal defendant the right to representation by counsel. State v. Burns, 6 S.W.3d 453, 461 (Tenn. 1999); Baxter v. Rose, 523 S.W.2d 930, 936 (Tenn. 1975). Both the United States Supreme Court and the Tennessee Supreme Court have recognized that the right to such representation includes the right to "reasonably effective" assistance, that is, within the range of competence demanded of attorneys in criminal cases. Strickland v. Washington, 466 U.S. 668, 687 (1984); Burns, 6 S.W.3d at 461; Baxter, 523 S.W.2d at 936.

In evaluating a lawyer's performance, the reviewing court uses an objective standard of "reasonableness." Strickland, 466 U.S. at 688; Burns, 6 S.W.3d at 462. The reviewing court must be highly deferential to counsel's choices "and should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Burns, 6 S.W.3d at 462; see also Strickland, 466 U.S. at 689. The court should not use the benefit of hindsight to second-guess trial strategy or to criticize counsel's tactics, see Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982), and counsel's alleged errors should be judged in light of all the facts and circumstances as of the time they were made, see Strickland, 466 U.S. at 690; Hicks v. State, 983 S.W.2d 240, 246 (Tenn. Crim. App. 1998).

In State v. Gilmore, this Court explained as follows:

> When an accused seeks to substitute counsel, the accused has the burden of establishing to the satisfaction of the trial judge that (a) the representation being furnished by counsel is ineffective, inadequate, and falls below the range of competency expected of defense counsel in criminal prosecutions, (b) the accused and appointed counsel have become embroiled in an irreconcilable conflict, or (c) there has been a complete breakdown in communications between them. Whether an accused is entitled to a substitution of counsel is a question which addresses itself to the sound discretion of the trial court.

823 S.W.2d 566, 568-69 (Tenn. Crim. App. 1991) (footnotes omitted). "Although an indigent criminal defendant has a constitutional right to appointed counsel, that right may not be used as a license to manipulate, delay, or disrupt a trial." State v. Carruthers, 35 S.W.3d 516, 549 (Tenn. 2000). The trial court has "wide discretion" regarding the appointment and relief of counsel and its "action will not be set aside on appeal unless it is shown that there was a plain abuse of that discretion." State v. Rubio, 746 S.W.2d 732, 737 (Tenn. Crim. App. 1987). "In order for a reviewing court to find an abuse of discretion, the court must find that there was no substantial evidence to support the conclusion of the trial judge." Id.

We conclude that the trial court did not abuse its discretion when it denied the Defendant's motion for the appointment of substitute counsel. Although the Defendant made broad assertions of his appointed counsel's shortcomings, he failed to articulate sufficient facts to establish that his appointed counsel was ineffective, inadequate, or fell below the range of competency expected of defense counsel in criminal prosecutions. Moreover, we note that none of the Defendant's allegations of his appointed counsel's ineffectiveness pertained to the sentencing hearing phase of the trial or provided the trial court with sufficient evidence to find that Trial Counsel would not have been an effective advocate for the Defendant during his sentencing hearing. Finally, although the Defendant claims he made his motion to appoint substitute counsel in good faith and was not attempting to delay the proceedings, the timing of his motion indicates otherwise.[4] The Defendant is not entitled to relief on this issue.

**Conclusion**

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

_____
DAVID H. WELLES, JUDGE

---

[4] The Defendant claims that he filed his motion and affidavit the day before the sentencing hearing, which was conducted on September 17, 2008. The Defendant's trial was held over two months earlier, on July 7-9, 2008.